ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **KARMÍN ROSADO MARTÍNEZ**<br>DEMANDANTE(S)-APELANTE(S)<br><br>V.<br><br>**BANCO POPULAR DE PUERTO RICO**<br>DEMANDADA(S)-APELADA(S) | **KLAN202400117** | ***APELACIÓN***<br>procedente del Tribunal de Primera Instancia, Sala Superior de **SAN JUAN**<br><br>Caso Núm.<br>**SJ2021CV07907** (903)<br><br>Sobre:<br>Ley de Represalia; Ley 115 de 20 de diciembre de 1991; Despido Injustificado; Procedimiento Sumario; Daños y Perjuicios |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón.

*Barresi Ramos*, juez ponente.

### S E N T E N C I A

En San Juan, Puerto Rico, hoy día 6 de mayo de 2026.

Comparece ante este Tribunal de Apelaciones, la señora **KARMÍN ROSADO MARTÍNEZ** (señora **ROSADO MARTÍNEZ**) mediante *Apelación Civil* entablada el 9 de febrero de 2024. En su recurso, nos solicita que revisemos la *Sentencia* decretada el 2 de febrero de 2024 por el Tribunal de Primera Instancia (TPI), Sala Superior de San Juan.[1] Mediante la aludida *Sentencia*, el foro *a quo* declaró *ha lugar* la *Solicitud de Sentencia Sumaria* presentada el 8 de septiembre de 2023 por **BANCO POPULAR DE PUERTO RICO** (**BPPR**); y desestimó, con perjuicio, la *Demanda*.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

---

[1] Esta determinación judicial fue notificada y archivada en autos el 2 de febrero de 2024. Apéndice de la *Apelación Civil*, págs. 586-624.

Número Identificador: SEN2026_____

## - I -

El 1 de diciembre de 2021, la señora **ROSADO MARTÍNEZ** incoó *Demanda* sobre represalias y despido injustificado al amparo de las disposiciones de la *Ley sobre Despidos Injustificados*.[2] En su escrito, expuso que comenzó a laborar en septiembre de 1992 como asistente administrativo a tiempo determinado en la división de préstamos especiales. Añadió que, ha cumplido con las expectativas de su puesto; acudió a la oficina de recursos humanos para denunciar conducta de la señora Sonia Acosta Martinó (supervisora); y fue degradada de asistente administrativa a recepcionista.[3] Arguyó además que, para el 14 de octubre de 2021, fue llamada para una reunión con la señora Michelle Otero, de la oficina de recursos humanos, en la cual se le imputó haberse apropiado ilegalmente una bolsa de papitas y/o galletas en La Hacienda.[4] Por ende, la señora **ROSADO MARTÍNEZ** fue despedida. Razón por la cual, entre otras cosas, requirió la reinstalación a su puesto; el cese y desista de actuaciones de represalias; el pago de los salarios dejados de devengar; y la penalidad dispuesta por ley.[5]

El 20 de diciembre de 2021, el **BPPR** presentó su *Contestación a Demanda*.[6] En pocas palabras, ratificó que el despido fue por haber incurrido en una crasa falta de integridad y deshonestidad en violación a los valores del **BPPR** y las normas dispuestas en el *Manual de Empleados* y Código de Ética.

Tiempo después, el 22 de septiembre de 2022, la señora **ROSADO MARTÍNEZ** presentó *Moción Solicitando Autorización para Presentar Demanda Enmendada*.[7] El 14 de octubre de 2022, **BPPR** presentó su *Moción en Oposición a Solicitud de Enmendar la Demanda*.[8] Ante esta situación, el 14

---

[2] Apéndice de la *Apelación Civil*, págs. 1-6. Ley Núm. 80 de 30 de mayo de 1976, según enmendada. 29 LPRA § 185a.

[3] La señora **ROSADO MARTÍNEZ** contendió que fue degradada del puesto de asistente administrativa a recepcionista como un acto de represalia, luego de haber presentado una querella interna por trato hostil a la señora Acosta Martinó, su supervisora.

[4] Se desprende del expediente que el valor total aproximado de dichos artículos es de $3.50. La Hacienda está ubicada en el lobby del edificio Popular Center en Hato Rey y es inquilino.

[5] Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, conocida como "*Ley de Represalias contra el Empleado por Ofrecer Testimonio*". 29 LPRA § 194.

[6] Apéndice de la *Apelación Civil*, págs. 10-18.

[7] *Íd.*, págs. 64-71.

[8] *Íd.*, págs. 78-84.

de octubre de 2022, el foro a quo emitió *Resolución* declarando no ha lugar la súplica de enmendar la *Demanda* para incluir tercero.[9]

Luego de varios trámites procesales, el 8 de septiembre de 2023, el **BPPR** presentó una *Solicitud de Sentencia Sumaria*.[10] El 20 de septiembre de 2023, la señora **ROSADO MARTÍNEZ** presentó una *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial*.[11] Al poco tiempo, el 10 de octubre de 2023, el **BPPR** presentó una *Oposición a Solicitud de Sentencia Parcial y Réplica a Oposición a Solicitud de Sentencia Sumaria*.[12] El 18 de octubre de 2023, la señora **ROSADO MARTÍNEZ** presentó su *Réplica a Oposición a Moción de Sentencia Sumaria Parcial y Dúplica a Solicitud de Sentencia Sumaria*.[13] En seguida, el 6 de noviembre de 2023, el **BPPR** presentó una *Réplica a Solicitud de Sentencia Sumaria Parcial y Dúplica a Oposición a Solicitud de Sentencia Sumaria*.[14]

Finalmente, el 2 de febrero de 2024, el foro primario pronunció la *Sentencia* apelada. En su dictamen formuló noventa y ocho (98) determinaciones de hechos, a saber:

---

[9] Apéndice de la *Apelación Civil*, pág. 85.

[10] *Íd.*, págs. 146-473. Dicho petitorio está acompañado de los siguientes documentos: (i) Anejo 1– extracto de Deposición de la señora **ROSADO MARTÍNEZ** de 13 de febrero de 2023, págs. 183-219; (ii) Anejo 2– Solicitudes de Acción Personal, págs. 220- 225; (iii) Anejo 3– Contratos de empleo temporero, págs. 226- 231; (iv) Anejo 4– Notificación de nombramiento, pág. 232; (v) Anejo 5– Referencia a títulos en el empleo de la señora **ROSADO MARTÍNEZ**, págs. 233- 253; (vi) Anejo 6– Correo electrónico de 5 de marzo de 2019, pág. 254; (vii) Anejo 7– Informe de acuses electrónicos del *Manual de Empleados*, pág. 255- 256; (viii) Anejo 8– *Manual de Empleados* (Código de Ética), págs. 257- 380; (ix) Anejo 9– Contestación a Primer Pliego de Interrogatorio y Requerimiento de Producción de Documentos, págs. 381-388; (x) Anejo 10– Informe de investigación, págs. 389- 419; (xi) Anejo 11- Carta de Shaira Martínez de 20 de septiembre de 2021, págs. 420- 422; (xii) Anejo 12– Declaración Jurada de M. Lugo Rodríguez, págs.. 423- 428; (xiii) Anejo 13– Video de seguridad de La Hacienda (USB), pág. 429; (xiv) Anejo 14– Videos de seguridad **BPPR** (USB), pág. 430; (xv) Anejo 15 – Captura de imágenes de 16 de septiembre de 2021, págs. 431- 448; (xvi) Anejo 16- Relato de la señora **ROSADO MARTÍNEZ** de 13 de abril de 2021, págs. 449- 450; (xvii) Anejo 17– Correo electrónico 19 de abril de 2021, pág. 451; (xviii) Anejo 18– Cadena de correos electrónicos, pág. 452- 455; (xix) Anejo 19– Relato de la señora **ROSADO MARTÍNEZ** de 20 de abril de 2021, pág. 456; (xx) Anejo 20– Correo electrónico de 29 de abril de 2021, pág. 457; (xxi) Anejo 21– Correo electrónico de 13 de mayo de 2021, pág. 458; (xxii) Anejo 22– Resumen de cambios organizacionales, pág. 459; (xxiii) Anejo 23 – Resumen de cambios en compensación, págs. 460- 461; (xxiv) Anejo 24 – Correo electrónico de 15 de junio de 2021, pág. 462- 471.

[11] Apéndice de la *Apelación Civil*, págs. 478-529. Esta solicitud tiene anejada los siguientes documentos: (i) Declaración Jurada suscrita el 20 de septiembre de 2023 por la señora **ROSADO MARTÍNEZ**, págs. 530- 533; (ii) Normas de conducta, pág. 534; (iii) extracto de deposición, págs. 535-538; (iv) Planilla de Contribución sobre Ingresos de Individuos, págs. 539-546.

[12] Apéndice de la *Apelación Civil*, págs. 548-566.

[13] *Íd.*, págs. 567-575.

[14] *Íd.*, págs. 578-584.

1. Karmín Rosado comenzó a trabajar como empleada regular de BPPR el 1 de septiembre de 1992.

2. Previo a trabajar como empleada regular en el BPPR, Karmín Rosado trabajó como empleada por contrato temporero, ocupando las posiciones de Recepcionista y Secretaria.

3. Karmín Rosado trabajó un tiempo en la Sucursal de la Plazoleta del Condado, pero para el año 1992 pasó a trabajar en el edificio Popular Center en Hato Rey.

4. Cuando Karmín Rosado comenzó como empleada regular de BPPR, esta comenzó en la posición de Oficinista para el área de Préstamos de Construcción.

5. Luego de más de 15 años en la División de Préstamos de Construcción, Karmín Rosado pasó a la División de Préstamos Especiales.

6. A través del empleo de Rosado con BPPR, la Compañía hizo referencia a la posición de la querellante con distintos títulos. Por ejemplo, en el año 1999 se refirieron a la posición como "Recepcionista, Oficinista y Mecanógrafa". Para los años 1992 al 1995, récords de la empresa se refirieron a la posición como "Oficinista Mecanógrafa II & Recepcionista" y como "Oficinista Mecanógrafa".

7. En o alrededor de marzo de 2019 la querellante fue asignada al área de Recepción de la División de Préstamos Especiales.

8. Según testificó la querellante durante su deposición, con el cambio al área de Recepción de la División de Préstamos Especiales a ésta le "asignaron algunas cosas y otras seguía haciendo lo mismo. Cuando digo 'lo mismo', haciendo cartas, enviándolas certificadas, ayudando a los oficiales. Aunque era recepcionista, siempre estuve disponible para todos ellos".

9. Cuando comenzó a trabajar en BPPR, Karmín Rosado recibió copia del Manual de Empleados y las políticas de la Compañía.

10. Con posterioridad y a través de todos los años que trabajó para BPPR, Karmín Rosado recibía copia, en papel y luego electrónicamente, de las actualizaciones que se hacían periódicamente al Manual de Empleados y el Código de Ética.

11. De conformidad con el Manual de Empleados, la integridad es uno de los valores principales de BPPR.

12. El Código de Ética de BPPR establece que "[n]uestros altos estándares de ética, integridad y honestidad definen nuestra cultura corporativa".

13. Según el Código de Ética de BPPR, "[c]ualquier violación al Código será considerada una ofensa seria y podrá dar base a acciones disciplinarias, incluyendo la terminación de empleo o relación con Popular".

14. El Código de Ética de BPPR también establece que los "empleados deben actuar de manera consistente con los altos estándares de ética y conducta profesional de Popular" aún en actividades fuera del trabajo pues las actuaciones fuera del trabajo pueden afectar la reputación y marca de Popular, "así como la relación con nuestros compañeros de trabajo, clientes, suplidores y el público en general".

15. La Norma de Conducta #13 de BPPR requiere a los empleados:
> Desempeñarse con integridad y honestidad. Cooperar en cualquier proceso investigativo. Evitar cometer fraude, malversación u otro delito público, o hacer intento de ello, contra Popular, sus compañías, clientes, suplidores, relacionados, empleados o familiares o contra cualquier otra entidad".

16. La Norma de Conducta # 13 incluye como ejemplos de desviaciones a dicha norma que conllevan la terminación de empleo al primer incidente:

> b. Cometer o intentar cometer fraude, malversación u
> otro delito contra cualquier compañía Popular, sus clientes, relacionados, suplidores, empleados, familiares o contra cualquier otra entidad.
> [...]
> d. Sustraer o tomar para sí dinero o activos de Popular, de clientes, suplidores u otros, ya sea de forma manual o electrónica, para beneficio propio o de un tercero.

17. Mientras fue empleada de BPPR la dirección de correo electrónico de Karmín Rosado era: karmin.rosado@popular.com.

18. Como institución bancaria, el BPPR utiliza diversos mecanismos de seguridad incluyendo, pero sin limitarse, al uso de cámaras de seguridad.

19. El área de recepción de la División de Préstamos Especiales, localizada en el Piso 8 del edificio Popular Center, es un área de acceso público en la que ubica una cámara de seguridad.

20. Mientras Karmín Rosado trabajó como Recepcionista en el escritorio ubicado en dicha área podía ser captada por la cámara de seguridad.

21. Según el Informe de Investigación, Carlos Pabón Irizarry, Oficial de Seguridad de BPPR, declaró que el 16 de septiembre de 2021 recibió una llamada de Carlos Ortiz, Project Manager de Saint James, encargados del servicio de seguridad de las dependencias de BPPR debido a que la gerente de La Hacienda deseaba discutir un incidente sobre el cual presuntamente Karmín Rosado se había apropiado de mercancía.

22. Según el Informe de Investigación, la gerente de La Hacienda informó que una persona que acostumbraba a comprar alimentos en el establecimiento llegó al local, ordenó y pagó una comida, luego se apropió sin paga de cierta mercancía y se marchó.

23. El 20 de septiembre de 2021, Shaira Martínez Díaz ("Martínez"), Gerente Operacional de La Hacienda le dirigió una carta a la Oficina de Seguridad del BPPR detallando el incidente.

24. Según la carta de la gerente Martínez, Mareliz Lugo Rodríguez ("Lugo"), empleada de La Hacienda, atendió a una dama de tez blanca y pelo castaño a la que sólo se le cobró "una pasta del deli". Según detalló Martínez, Lugo previamente "se había percatado de una actitud sospechosa en la clienta".

25. La gerente Martínez indicó además que: "[u]na vez culminada la transacción de compra, la clienta procede a recoger cubiertos y servilletas y luego se dirige al área de la tienda (área de mesas). Luego de dar varias vueltas en dicha área decide marcharse y es cuando la Sra. Lugo nota que entre la bolsa de compra que llevaba y su pecho escondía un paquete de snacks 'Dirty potato chips'".

26. La gerente Martínez indicó además que la empleada Lugo verificó los recibos de la caja registradora para verificar "si la dama pagó por ese artículo y en el recibo de compra no apareció nada". Esta informó además que la empleada Lugo le preguntó a otros empleados de la tienda para verificar si alguno cobró la mercancía a lo que esta indicó que ninguno le cobró.

27. Según la carta de la gerente Martínez, en la tarde del 16 de septiembre de 2021, "estuv[ieron] verificando [sus] cámaras de seguridad", y confirmaron que la clienta, en efecto, se había apropiado ilegalmente "de un paquete de galletas, el cual guarda dentro de su bolsa de compra" y un "paquete de Dirty potato chips" que "esconde entre su bolsa de compra y su pecho".

28. La empleada Lugo prestó una declaración jurada sobre el incidente del 16 de septiembre de 2021.

29. Según Lugo, en una ocasión previo al 16 de septiembre de 2021, atendió "a una clienta regular" a quien reconocía "como empleada de Banco Popular ya que siempre llevaba su tarjeta de identificación visible. Era una clienta que visitaba la tienda casi a diario. Era una señora de mediana edad, cabello castaño y tez blanca." En dicha ocasión, Lugo le cobró a la clienta una ensalada, pero se percató que luego de haberle cobrado a la clienta, ésta "pasó al área de las mesas y se le cayó la bolsa al suelo," percatándose Lugo que al recoger la bolsa la clienta además de echar la ensalada que le habían cobrado, "echó una bolsa mediana de galletas de guayaba marca Enhorabuena."

30. Según Lugo, le "estuvo raro que echara galletas en la bolsa", ya que Lugo sólo le había cobrado una ensalada. Lugo verificó los recibos de compra y confirmó que la clienta sólo había pagado la ensalada. Lugo se lo notificó a Johana Arana ("Arana"), Gerente de La Hacienda, quien solicitó los videos de seguridad de la tienda, pero en esa ocasión no estuvieron disponibles.

31. Según Lugo, el 16 de septiembre de 2021, mientras ella trabajaba, llegó a la tienda la misma clienta y Lugo le sirvió, pesó y entregó una libra de la pasta del día. Lugo le comentó a su compañera Adamaris Méndez que esa señora era la misma del incidente previo. Lugo posteriormente observó que la clienta "caminó por el área de las mesas de los productos de la tienda" y cuando estaba saliendo Lugo notó que tenía una bolsa de papitas entre su pecho y la bolsa de la tienda. Inmediatamente, Lugo le preguntó al cajero Miguel Fonseca si éste le había cobrado a la clienta algo adicional a la pasta, cuando Fonseca indica que no recuerda, buscaron la transacción y confirmaron que sólo había pagado "una libra de pasta".

32. El 16 de septiembre de 2021, inmediatamente después de verificar que la clienta sólo había pagado la pasta, Lugo imprimió el recibo de compra y le notificó a la gerente Arana lo sucedido.

33. Asimismo, la empleada Lugo informó que la gerente Arana le solicitó a Lugo "que fuera a la farmacia que está al lado de La Hacienda para que viera si una dama que estaba comprando en la farmacia era la misma persona de los incidentes" que Lugo le había notificado. Lugo fue a la farmacia y la "identifi[có] claramente en el área del recetario".

34. Debido a la queja por parte de La Hacienda, el BPPR llevó a cabo una investigación que corroboró que la identidad de la dama del incidente en La Hacienda el 16 de septiembre de 2021 era Karmín Rosado.

35. La investigación de BPPR estuvo a cargo de Favier Santana, Auditor Investigativo Senior de BPPR.

36. Santana preparó un informe detallado de la referida investigación.

37. Como parte de su investigación, Santana evaluó los videos de las cámaras de seguridad que le fueron suministrados por La Hacienda.

38. Santana también evaluó el recibo de compra suministrado por La Hacienda que refleja que sólo se cobró una pasta deli con valor de $7.74, que se pagó en efectivo un total de $8.28 (la pasta más el correspondiente impuesto) con un billete de $10[.00] y que el cajero le devolvió a la clienta $1.72.

39. Durante su deposición, Karmín Rosado admitió que la mercancía que compró en La Hacienda la pagó en una sola transacción y que la pagó en efectivo.

40. Favier Santana también verificó el registro de entrada y salida de la querellante, las cuentas de banco de la querellante con BPPR

y las imágenes captadas por el sistema de seguridad de Popular Center para el 16 de septiembre de 2021.

41. En su informe de investigación Favier Santana indicó que las imágenes de las cámaras de seguridad de BPPR que evaluó muestran gráficamente distintos movimientos de la querellante desde que llegó esa mañana al edificio, cuando más tarde pasó por la ATH a realizar un retiro de $10[.00], cuando subió a su área de trabajo en la recepción del piso 8 de Popular Center, cuando se dirigió al área de La Hacienda, cuando salió de La Hacienda, cuando se dirigió nuevamente a su área de trabajo con la funda de La Hacienda y cuando se sentó en su escritorio a ingerir alimentos.

42. Según la investigación de Favier Santana, al comparar la hora del recibo de compra y la hora que aparece en el video de La Hacienda, notó que había una diferencia de 1 hora y 34 minutos. Expone Favier Santana que la Gerente de La Hacienda confirmó que el sistema de visuales estaba funcionando "con un delay en el tiempo registrado".

43. Según la investigación de Favier Santana, al verificar las cámaras del edificio Popular Center y comparar los videos con el recibo de compra que suministró La Hacienda, el recibo concordaba con la hora en la que se observa a Karmín Rosado realizar el pago en la caja registradora de La Hacienda.

44. El 14 de octubre de 2021 Favier Santana y Michelle Otero, HR Officer de BPPR, entrevistaron a la querellante.

45. Antes del 14 de octubre de 2021, Karmín Rosado nunca había visto a Favier Santana.

46. Según el Informe de Investigación, durante dicha entrevista Karmín Rosado admitió ser clienta habitual de La Hacienda.

47. La querellante frecuentaba mucho La Hacienda. Según la querellante, "los empleados eran muy agradables, muy cordiales; de verdad. Y me gustaba la comida de ellos, no tenía problemas. Iba cuatro, hasta cinco días, sí."

48. Según el Informe de Investigación, durante la entrevista a la querellante se le mostraron los videos de las cámaras de La Hacienda del 16 de septiembre de 2021, pero está negó que fuese ella la persona en el video. Dijo que el pelo se parecía "pero que los zapatos que tenía la dama en las imágenes no son su estilo".

49. Según el Informe de Investigación, durante la entrevista la querellante fue confrontada con el hecho que ese día llevaba un reloj de esfera blanco en la mano derecha semejante al que llevaba la persona en los videos de seguridad de La Hacienda del 16 de septiembre de 2021, y su contestación fue que le encantaban los relojes y tenía muchos.

50. Karmín Rosado siempre usa su reloj en la mano derecha.

51. Según el Informe de Investigación, durante dicha entrevista, Karmín Rosado admitió que no comparte su área de trabajo con otros compañeros e indicó que era ella la persona que siempre estaba ubicada en la recepción del Piso 8 de Popular Center.

52. Según el Informe de Investigación, durante la entrevista Favier Santana y Michelle Otero mostraron a la querellante imágenes del 16 de septiembre de 2021, en las que se podía observar cuando la querellante llegaba a su escritorio y se aprecia que es la misma persona que sale en las imágenes de La Hacienda de ese mismo día, pero la querellante negó que fuese ella.

53. Según el Informe de Investigación, durante la entrevista le solicitaron a la querellante que explicara quién era entonces la persona que el 16 de septiembre de 2021 estaba en ese momento en su área de trabajo y ésta evadió la pregunta e insistió en que no era ella.

54. Durante su deposición, Karmín Rosado admitió que la persona que aparece en la imagen producida y numerada 615 se parece a ella, pero Rosado no sabe si es ella "porque verdaderamente estoy mirando el calzado, no se me parece a mí".

55. Durante su deposición, Karmín Rosado admitió que ella era la persona en las imágenes producidas y numeradas 616-617, 619, 625-626, 628-631.

56. Las imágenes 616-617, 619, 625-626, 628-631 muestran a Karmín Rosado el 16 de septiembre de 2021 en su área de trabajo en el Piso 8. También la muestran en su área de trabajo con la funda de La Hacienda en la mano.

57. En su Informe de Investigación, Favier Santana concluyó que luego de evaluar la documentación y las imágenes captadas por los sistemas de seguridad, concluía que la persona que aparece en las imágenes suministradas por La Hacienda y la persona que se presenta en la recepción del Piso 8 del Popular Center es la misma persona.

58. En su Informe de Investigación, Favier Santana concluyó que dicha persona es Karmín Rosado y que su identidad se pudo confirmar no sólo en imágenes en las que se ve su rostro, sino que se confirmó por el uso de la tarjeta de empleada para entrar al área de las oficinas del Piso 8 y del retiro de $10[.00] con ATH, lo cual concuerda con las imágenes y horarios evaluados.

59. Karmín Rosado fue despedida de su empleo en el BPPR el 14 de octubre de 2021.

60. Favier Santana y Michelle Otero fueron quienes notificaron la decisión de despido a la querellante.

61. Karmín Rosado entiende que su despido está relacionado con la queja que sometió contra su supervisora, Sonia Acosta, en abril de 2021 porque la acusación del robo "salió de la nada" y entiende que la querían despedir "y esa fue la forma que buscaron".

62. En su deposición la querellante admitió que no sabe quién tomó la determinación de despedirla.

63. En su deposición la querellante admitió que no sabe quién se comunicó con BPPR para quejarse del incidente de La Hacienda.

64. En su deposición la querellante admitió que "ni los años de servicio, ni la buena trayectoria, excusan que un empleado incurra en una apropiación ilegal".

65. En su deposición la querellante admitió que, si un empleado incurre en una apropiación ilegal, independientemente de los años de servicio e independientemente de la trayectoria buena que haya tenido, si se prueba la apropiación, es razón justificada para un despido.

66. Según Karmín Rosado, para el 13 de abril de 2021 comenzó a sentirse enferma con lo que entendía eran síntomas de COVID-19.

67. Debido a ello, se comunicó con el Wellness Center de BPPR.

68. El On-Site Health and Wellness Center es un centro de bienestar ubicado en el Popular Center que está disponible como beneficio para los empleados de BPPR.

69. El jueves, 15 de abril de 2021 Rosado se hizo una prueba de COVID19.

70. El lunes 19 de abril de 2021, Sonia Acosta, Gerente de la División de Préstamos Especiales y supervisora directa de la querellante, le preguntó a ésta mediante correo electrónico si había recibido el resultado de la prueba de COVID-19.

71. El martes 20 de abril de 2021, la querellante le respondió a Sonia Acosta que el día anterior "fue que estuvieron listos" y le indicó a Sonia Acosta que le había llevado los resultados a la Dra. Pagán, uno de los médicos del On-Site Health and Wellness Center, y ésta última nunca la llamó para decirle nada.

72. En respuesta a dicho correo electrónico, Sonia Acosta le envió un correo electrónico a Karmín Rosado en el que le indicó lo siguiente:

> "Karmin, me dejas saber si fue negativo. Me está bien raro. Yo me hice la prueba ayer y me llego el resultado en 1 hora. Hablamos y gracias".

73. Karmín Rosado le contestó a Sonia Acosta "me da mucha pena tu comentario porque siento que estás dudando de mi palabra. Voy a bajar ahora a pedir una copia pues ayer se las lleve a la Dra. Pagán y nunca me llamó, te la envío tan pronto me la entreguen".

74. En respuesta a dicha comunicación, Sonia Acosta le envió un correo electrónico a Karmín Rosado en la que le indicó que no estaba dudando de su palabra, "pero si la prueba fuese positiva, te tienes que ir a tu casa a recuperarte. Eso es todo. [...] Espero que entiendas que es mi responsabilidad darte seguimiento sobre el tema".

75. Según la querellante, como preámbulo a dicho intercambio de correos electrónicos, Sonia Acosta la llamó para preguntarle por los resultados de la prueba de COVID-19 y cuando Rosado le dijo que no había abierto el sobre con los resultados de la prueba, Sonia Acosta le gritó y le dijo que era responsabilidad de ella abrir el sobre para saber el resultado.

76. Según relató la querellante, "no soy médico para interpretar ningún resultado de pruebas realizadas pues no sé hacerlo".

77. El 20 de abril de 2021 la querellante se comunicó con Michelle Otero, HR Officer, para traer a su atención la situación con Sonia Acosta pues, según Karmín Rosado, Sonia Acosta la había tratado con hostilidad.

78. Según la querellante, Michelle Otero la trató cordialmente durante su conversación del 20 de abril de 2021.

79. Durante su conversación con Michelle Otero el 20 de abril de 2021, la querellante le solicitó a esta que dialogara con Sonia Acosta sobre el incidente de ese mismo día.

80. El 29 de abril de 2021 la querellante envió un correo electrónico a Michelle Otero preguntándole si había podido hablar con Sonia Acosta sobre el incidente del 20 de abril de 2021.

81. El 3 de mayo de 2021, Michelle Otero le contestó a la querellante confirmándole que, en efecto, había hablado con Sonia Acosta y que se estaría comunicando luego para dialogar sobre el asunto.

82. Michelle Otero llevó a cabo una investigación en cuanto a la situación presuntamente ocurrida entre la querellante y Sonia Acosta el 20 de abril de 2021. Como parte de dicha investigación, Michelle Otero revisó varias comunicaciones electrónicas entre la querellante y Acosta y las entrevistó a ambas.

83. Michelle Otero y Karmín Rosado dialogaron el 6 de mayo de 2021.

84. El 17 de mayo de 2021, Michelle Otero le notificó a la querellante una confirmación escrita de los hallazgos de la referida investigación.

85. En su conclusión, Michelle Otero le indicó a la querellante que se habían investigado las alegaciones presentadas y que se desprendía que la comunicación entre ella y Sonia Acosta "pudiera no haber sido efectiva y que, por tanto, se debe mejorar para evitar malinterpretaciones. De todos modos, se le exhortó a la Sra. Acosta a continuar manteniendo una comunicación cordial, profesional y respetuosa".

86. El 17 de mayo de 2021, luego de la querellante recibir los hallazgos de la investigación, le envió un correo electrónico a Michelle Otero en el que corrigió ciertos detalles, como la fecha y lugar en donde se había hecho la prueba de laboratorio, y le indicó

que seguía "bajo daño emocional pues ahora en represalia a la queja que realice me quieren transferir a otra área y de no aceptarla conlleva una disminución a mi posición actual".

87. Michelle Otero inmediatamente le respondió que, en cuanto a su alegado daño emocional por situaciones de trabajo, si interesaba se podía completar el informe del Fondo del Seguro del Estado ("CFSE") para que la querellante de forma voluntaria solicitara asistencia profesional y médica ante dicha agencia.

88. En el correo electrónico dirigido a Karmín Rosado, Michelle Otero le explicó respecto al posible cambio en puesto y transferencia de unidad.

89. La querellante había escuchado sobre la estrategia de nivelación de puestos "en los pasillos".

90. La querellante no se comunicó con Recursos Humanos para preguntar qué era la estrategia de nivelación de puestos.

91. Cuando a la querellante le notificaron que su título cambiaría de Asistente Administrativa a Recepcionista como resultado de la iniciativa de nivelación de puestos no le dijeron que tendría cambio en sus funciones.

92. La querellante no recuerda que Sonia Acosta le hubiese mencionado la iniciativa de nivelación de puestos y le hubiese hablado de la posibilidad de que mantuviese el título de Asistente Administrativa a través de una transferencia al Grupo de Administración.

93. El 13 de mayo de 2021, Karmín Rosado envió un correo electrónico a Sonia Acosta en el que preguntaba por "mi nuevo cambio de área con Daira Vaello" y "el significado real del proyecto del Banco de Job Leveling".

94. El 13 de mayo de 2021, Sonia Acosta le contestó a Karmín Rosado por correo electrónico con lo siguiente:

> Karmin, según te comenté en nuestra llamada de ayer, hoy he tenido varias reuniones y todavía tengo otras esta tarde, por lo que en estos momentos se me hace difícil atender esta petición. En la llamada habíamos acordado hablar mañana viernes para aclarar tus dudas. Como sabes, te expliqué en detalle en nuestra llamada inicial del pasado jueves 6 de mayo, sobre la necesidad del Grupo de Administración por las nuevas funciones adquiridas relacionadas a los procesos de quiebra. Como Gerente, tengo que atender las necesidades del negocio y establecer prioridades. Te expliqué también la iniciativa Corporativa del Job Leveling y sobre el cambio de título de la posición que actualmente ocupas. También te expliqué que este cambio propuesto es uno positivo para ti, ya que la transferencia al Grupo de Administración te permitiría mantener el título actual de Asistente Administrativa por el cambio de tareas. (que son las descritas en el documento que te envié por email el martes 11 de mayo) Me dejas saber cuál es tu duda o preocupación que no haya contestado en nuestra conversación de ayer 12 de mayo. Estoy disponible mañana a las 9am para aclarar tus dudas. Como te mencioné, tengo una ventana limitada hasta mañana para procesar el cambio, antes de que entren en vigor los cambios por la iniciativa de Job Leveling.

95. El 18 de mayo de 2021 Karmín Rosado le preguntó a Michelle Otero que cómo se afectaría su nómina si se acogía a una licencia del Fondo del Seguro del Estado. Michelle Otero inmediatamente

le contestó con la información solicitada y la querellante respondió: "Gracias por estar disponible siempre orientando y escuchando al empleado, estoy muy agradecida".

96. Según surge de la tabla con información de los cambios organizaciones de Karmín Rosado, el 7 de junio de 2021 a Karmín Rosado la cambiaron de puesto ("Job Change") debido a necesidades del negocio ("Business Needs").

97. Según surge de la tabla de compensación de Karmín Rosado, el 7 de junio de 2021, en la misma fecha en que ocurrió el cambio de puesto, su salario se mantuvo en la misma cantidad de $27,997.00.

98. El 15 de junio de 2021, el BPPR, por voz de Eduardo J. Negrón del Grupo de Administración envió un correo electrónico titulado "Nivelación de Puestos/ Job Leveling" dirigido a los empleados del BPPR. En este se dispuso lo siguiente:

> Estimados compañeros:
>
> En las últimas semanas han escuchado hablar de la Nivelación de Puestos al participar en conversaciones individuales con sus líderes. Espero que estas conversaciones hayan servido como vehículo para transmitir esta importante información, y para fomentar la comunicación efectiva y la confianza. Implementamos oficialmente la Nivelación de Puestos en nuestros sistemas, completando la primera fase de nuestra estrategia de compensación a largo plazo. Hemos escuchado sus comentarios durante varios años y esta estrategia fue creada en respuesta a lo que han expresado que es importante para su experiencia en Popular:
>
> *Mayor transparencia en la comunicación
> *Claridad en las oportunidades de crecimiento
> *Una estructura de puestos y compensaciones más clara y objetiva
>
> La Nivelación de Puestos atiende sus prioridades estableciendo niveles claros dentro de la organización, permitiendo la creación de planes de carrera y facilitando los procesos de movilidad interna. Esta nueva metodología también supone una oportunidad para trabajar con sus líderes en el desarrollo profesional y apoyar el crecimiento.
>
> En respuesta a las preguntas más comunes que se han planteado, hemos preparado el documento de Preguntas y Respuestas que encontrarás adjunto.
>
> Estos cambios representan un paso importante para atender sus comentarios y mejorar la experiencia de todos en Popular.
>
> Continuemos reforzando los canales de comunicación para fortalecer la transparencia y la confianza mientras seguimos preparándonos para el futuro.

En desacuerdo, el 9 de febrero de 2024, la señora **ROSADO MARTÍNEZ** interpuso ante nos un escrito intitulado *Apelación Civil.* En el mismo, señala el(los) siguiente(s) error(es):

> Erró el Tribunal de Primera Instancia al dictar sentencia desestimando la querella/demanda con perjuicio en su totalidad, mediante una solicitud de sentencia sumaria,

cuando existen controversia[s] en los hechos materiales y esenciales que requieren de un juicio plenario.

Consecutivamente, el 16 de febrero de 2024, intimamos *Resolución* en la cual concedimos un plazo perentorio de treinta (30) días para presentar alegato(s) en oposición al recurso. El 19 de marzo de 2024, el **BPPR** presentó su *Alegato en Oposición a Apelación*.

Evaluado concienzudamente el expediente del caso, y contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A - *SENTENCIA SUMARIA*

La *sentencia sumaria* es un mecanismo procesal disponible para adjudicar controversias sin la celebración de un juicio.[15] Su propósito o finalidad es propiciar la solución justa, rápida y económica de aquellos litigios civiles que no presentan controversias genuinas de hechos materiales, y en los cuales sólo resta dirimir una controversia de derecho.[16]

Este mecanismo se encuentra instituido en la Regla 36 de las de Procedimiento Civil de 2009.[17] Esta prescribe que cualquiera de las partes podrá presentar "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación".[18]

Lo anterior implica que, la parte promovente debe demostrar que no existe *controversia sustancial* sobre algún hecho material, pues la *sentencia*

---

[15] *Birriel Colón v. Econo y otro*, 213 DPR 80 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022).
[16] *Negrón Castro y otros v. Soler Bernardini y otros*, 2025 TSPR 96, resuelto el 6 de octubre de 2025; *BPPR v. Zorrilla y otro*, 214 DPR 329, 338 (2024).
[17] 32 LPRA Ap. V, R. 36. *Negrón Castro y otros v. Soler Bernardini y otros, supra*; *Jiménez Soto y otros v. Carolina Catering Corp. y otros*, 2025 TSPR 3, resuelto el 14 de enero de 2025.
[18] 32 LPRA Ap. V, R. 36.1 y 36.2. *Acevedo y otros v. Dpto. Hacienda y otros*, 212 DPR 335 (2023).

*sumaria* solo debe dictarse en casos claros, cuando el tribunal tenga ante sí la verdad sobre todos los hechos pertinentes.[19] Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable".[20] De esta manera, la parte promovente debe desglosar los hechos en párrafos debidamente numerados y, para cada uno de ellos, debe especificar la página o el párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.[21] Entre la evidencia que puede presentar, están las siguientes: "certificaciones, documentos públicos, admisiones de la parte contraria, deposiciones, contestaciones a interrogatorios, declaraciones juradas o affidávits, y hasta prueba oral".[22]

Por su parte, quien se opone a que se dicte *sentencia sumaria* está obligado a controvertir la prueba presentada, contestando de forma detallada y específica aquellos hechos pertinentes para demostrar que existe una *controversia real y sustancial* que debe dilucidarse en juicio.[23] Para ello debe cumplir con los mismos requisitos con que tiene que cumplir la parte promovente, pero, además, su solicitud debe contener:

> [U]na relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal.

---

[19] *Oriental Bank v. Caballero García*, 212 DPR 671 (2023).

[20] *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023).

[21] Regla 36.3(a) de las de Procedimiento Civil de 2009, *supra*; *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*.

[22] *Acevedo y otros v. Depto. Hacienda y otros*, *supra*, citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, LexisNexis, 2017, pág. 318. Véase, además, la Regla 36.5 de las de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36.5.

[23] *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 336 (2021); *Ramos Pérez v. Univisión*, 178 DPR 200, 214. (2010). La Regla 36.3 (b) de las de Procedimiento Civil de 2009 sobre la moción y procedimiento expone: La **contestación a la moción de sentencia sumaria** deberá ser presentada dentro del término de veinte (20) días de su notificación y deberá contener lo siguiente: (1) lo indicado en los subincisos (1), (2) y (3) del inciso anterior; (2) una relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (3) una enumeración de los hechos que no están en controversia, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (4) las razones por las cuales no debe ser dictada la sentencia, argumentando el derecho aplicable.

Cuando se presente una moción de sentencia sumaria y se sostenga en la forma provista en esta Regla 36, la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede.[24]

De no hacerlo, la parte opositora corre el riesgo de que la solicitud de *sentencia sumaria* sea acogida por el tribunal y se resuelva en su contra.[25] "Como regla general, para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente".[26] Es decir, no basta con presentar meras afirmaciones. Resulta insuficiente para derrotar una solicitud de *sentencia sumaria* una declaración jurada que meramente exponga conclusiones reiteradas de las alegaciones de la demanda y hechas sin conocimiento personal de los hechos.[27]

Al ponderar la procedencia de la solicitud de *sentencia sumaria* el tribunal **analizará los documentos que acompañan la moción de *sentencia sumaria*, los documentos incluidos con la moción en oposición y aquellos que obren en el expediente del tribunal**.[28] Por ello, "[t]oda inferencia que se haga a base de los hechos y documentos que obren en los autos, debe tomarse desde el punto de vista más favorable al que se opone a la solicitud de sentencia sumaria".[29] Más aún, el tribunal no tiene que considerar los hechos que no estén debidamente enumerados y no hagan referencia a los párrafos o páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establezcan.[30] Tampoco tiene la obligación

---

[24] Regla 36.3(b)(2) y (c) de las de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36.3(b)(2) y (c).

[25] *Ramos Pérez v. Univisión, supra,* pág. 215.

[26] *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 677 (2018); *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 168 (2011); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986).

[27] *Ramos Pérez v. Univisión, supra*, págs. 215-216.

[28] *Meléndez González et. al. v. M. Cuebas*, 193 DPR 100, 118-120 (2015); *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 913 (1994). (énfasis nuestro).

[29] *E.L.A. v. Cole*, 164 DPR 608, 626 (2005); *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 DPR 599, 610- 611 (2000).

[30] Regla 36.3(d) de las de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36.3(d). Véase,

de considerar o apreciar cualquier declaración jurada o de otra prueba admisible en evidencia a la cual no se haya hecho referencia en la relación de hechos.[31] No obstante, será el análisis del derecho aplicable y de la existencia de alguna *controversia sustancial de hechos materiales* lo que determinará si procede dictar sentencia sumariamente, y no el que la parte contraria deje de oponerse a la solicitud, o lo haga defectuosamente.[32]

Es preciso subrayar que, "cualquier duda no es suficiente para derrotar una moción de sentencia sumaria; por el contrario, tiene que ser una duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes".[33] Por tanto, "[existe] una controversia real cuando la prueba ante el tribunal es de tal naturaleza que un juzgador racional de los hechos podría resolver a favor de la parte promovida".[34]

La parte promovente puede prevalecer por la vía sumaria si presenta prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. En cambio, la parte promovida puede derrotar la moción de maneras diferentes: (1) si establece una controversia real de hechos sobre uno de los elementos de la causa de acción de la parte promovente; (2) si presenta prueba que apoye una defensa afirmativa; (3) si presenta prueba que establezca una controversia sobre la credibilidad de los testimonios jurados que presentó la parte promovente; o (4) no proceda en cuestión de derecho.[35]

La Regla 36.4 de las de Procedimiento Civil de 2009 delimita las instancias en que el Tribunal de Primera Instancia está obligado a consignar en su dictamen los hechos materiales sobre los cuales no hay controversia, y cuáles hechos materiales halló controvertidos; a saber: (1) no se dicta *sentencia* sobre la totalidad del pleito; (2) no se concede todo el remedio

---

además, *SLG Zapata-Rivera v. J.F. Montalvo, supra*, pág. 433.
[31] *Íd.*
[32] *Ortiz v. Holsum*, 190 DPR 511, 525 (2014).
[33] *Ramos Pérez v. Univisión, supra*, pág. 214.
[34] *Íd.*
[35] *Íd.*, pág. 217.

solicitado; y (3) se deniega la moción de *sentencia sumaria*.[36] Estas tres (3) instancias conllevan la celebración de una audiencia en su fondo. En estos casos, la consignación en la *sentencia sumaria* de los hechos materiales sobre los cuales no hay controversia sustancial hace innecesario presentar evidencia o prueba sobre estos durante el juicio.[37] Del mismo modo, el tribunal puede dictar *sentencia sumaria* de naturaleza interlocutoria para resolver cualquier controversia que existe entre las partes y sea separable de las controversias restantes.[38]

Dicho esto, este Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar [denegaciones] o concesiones de mociones de *sentencia sumaria*.[39] Esto significa que, al evaluar la solicitud de *sentencia sumaria*, al igual que el foro primario, debemos aplicar los criterios de la Regla 36 de las de Procedimiento Civil de 2009 y su jurisprudencia interpretativa.[40] Ello supone examinar el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de *sentencia sumaria*, llevando a cabo todas las inferencias permisibles a su favor.[41] Como resultado, tenemos el deber de revisar que tanto la moción de *sentencia sumaria* como su oposición cumplan con los

---

[36] 32 LPRA Ap. V, R. 36.4. **Regla 36.4. Pleito no decidido en virtud de moción**: Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la misma, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, y hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando los procedimientos ulteriores que sean justos en el pleito, incluso una vista evidenciaria limitada a los asuntos en controversia. Al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad. A base de las determinaciones realizadas en virtud de esta regla el tribunal dictará los correspondientes remedios, si alguno. *Pérez Vargas v. Office Depot,* 203 DPR 687, 697 (2019).
[37] *Íd.*
[38] 32 LPRA Ap. V, R. 36.3(e): "El tribunal podrá dictar sentencia sumaria de naturaleza interlocutoria para resolver cualquier controversia entre cualesquiera partes que sea separable de las controversias Reglas de Procedimiento Civil de Puerto Rico 55 restantes. Dicha sentencia podrá dictarse a favor o contra cualquier parte en el pleito".
[39] *Rosado Reyes v. Global Healthcare*, 205 DPR 796, 809 (2020); *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020); *Meléndez González et al. v. M. Cuebas, supra,* pág. 118.
[40] *Rosado Reyes v. Global Healthcare Group, LLC,* 205 DPR 796, 809 (2020); *Meléndez González v. M. Cuebas, Inc.,* supra, pág. 118.
[41] *Birriel Colón v. Supermercado Los Colobos, supra*; *Rosado Reyes v. Global Healthcare*, 205 DPR 796, 809 (2020); *Meléndez González v. M. Cuebas, Inc., supra*.

requisitos de forma instituidos en la Regla 36 de las de Procedimiento Civil de 2009.[42]

En esencia, si el foro primario **acogió la moción** y dictó sentencia sumariamente, nos corresponderá revisar si en realidad existen hechos materiales en controversia.[43] De existir, procederemos entonces a cumplir con la Regla 36.4 de las de Procedimiento Civil de 2009 exponiendo concretamente cuáles hechos hallamos que están en controversia y cuáles están incontrovertidos. Puede hacerse en la decisión en la cual se disponga del caso y hacer referencia al listado enumerado de hechos incontrovertidos dispuestos por el foro recurrido. Si determinamos que los hechos materiales realmente están incontrovertidos, se procederá a revisar *de novo* si el Tribunal de Primera Instancia adjudicó correctamente el derecho a la controversia.[44]

En palabras sencillas, los tribunales revisores estamos limitados a: (1) considerar los documentos que se presentaron ante el foro de instancia; (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales; y (3) comprobar si el derecho se aplicó de forma correcta.[45]

### - B – *DESPIDO INJUSTIFICADO*

Nuestro ordenamiento jurídico no prohíbe el despido de un empleado, sino que protege el derecho del trabajador puertorriqueño a la tenencia de su cargo de una manera más efectiva.[46] Por ello, la Ley Núm. 80, busca proteger los derechos de los trabajadores ante acciones arbitrarias y caprichosas de los patronos.[47]

Dicha legislación implanta las circunstancias particulares que se

---

[42] *Birriel Colón v. Supermercado Los Colobos, supra.*

[43] *Rivera Matos et al. v. Triple S et al., supra.*

[44] Véase Hon. Sigfrido Steidel et al., *Perspectivas en la Práctica Apelativa*, Ediciones Situm 2018, págs. 78–80.

[45] *Birriel Colón v. Supermercado Los Colobos, supra,* pág. 5; *Meléndez González et al. v. M. Cuebas, supra,* págs. 114–116.

[46] *Segarra Rivera v. International Shipping Agency, Inc.*; *Intership Tote, Inc./ Tote Maritime Puerto Rico, LLC y otros,* 208 DPR 964 (2022).

[47] *Íd.* Conocida como la *Ley Sobre Despidos Injustificados,* Ley Núm. 80 de 30 de mayo de 1976, según enmendada.

entenderán como *justa causa* para el despido de un empleado. Algunas de éstas están basadas en conductas atribuibles al obrero, entre ellas, se encuentran el patrón de **comportamiento impropio** o desordenado por parte del empleado; rendir el trabajo de manera deficiente, ineficiente, insatisfactorio, pobre, tardío o negligentemente o en violación a las normas de calidad del producto; o incurrir en violaciones reiteradas a las reglas y reglamentos establecidas para el funcionamiento del establecimiento. En lo particular, el Artículo 2 de la Ley Núm.80 instituye:[48]

> Se entenderá por justa causa para el despido de un empleado que no esté motivada por razones legalmente prohibidas y que no sea un mero capricho del patrono. Además, **se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento** que incluyen, entre otras, las siguientes:[49]
>
> (a) Que el empleado incurra en un patrón de **conducta impropia** o desordenada
>
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
>
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con esta sección.
>
> (e) Los cambios tecnológicos o de reorganización, así como los de escrito, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

Esta lista no es taxativa, sino que provee ejemplos "... sobre el tipo de conducta que constituye razón y motivo justificados para el despido, por estar reñido con la ordenada marcha y normal funcionamiento de una

---

[48] 29 LPRA § 185b.
[49] (énfasis nuestro).

empresa".[50]

Cónsono con lo anterior, nuestro ordenamiento jurídico ha facultado al patrono para crear reglamentos y normas razonables necesarias para el buen funcionamiento de la empresa que definan las faltas que podrían acarrear el despido como sanción.[51] Aun así, cabe señalar que la Ley Núm. 80, no favorece el despido como sanción a la primera falta. Sin embargo, se puede considerar como *justa causa* para la cesantía, siempre que dicha acción u omisión sea de tal gravedad que ponga en riesgo la seguridad, el orden o la eficiencia que constituyen el funcionamiento del negocio, pues sería una imprudencia esperar su reiteración para despedir al empleado.[52]

- III -

La señora ROSADO MARTÍNEZ puntea que el foro *a quo* primario se equivocó al dictar sentencia desestimando la *Demanda*, con perjuicio, en su totalidad, mediante una petitoria de sentencia sumaria, cuando existen controversias en los hechos materiales y esenciales que requieren de un juicio plenario. La señora ROSADO MARTÍNEZ razona que: (1) el informe de la investigación en su contra fue realizado por el señor Favier Santana Vázquez, auditor investigativo senior del **BPPR**, lo cual implica la existencia de un conflicto de interés; (2) el informe carece de una identificación apropiada de las cámaras y su localización; (3) no se le ha brindado la oportunidad de interrogar y contrainterrogar al señor Santana Vázquez, quien confeccionó el informe; (4) las cámaras y videos tienen horarios diferentes a los hechos alegados; y (5) el recibo presentado por La Hacienda no la identifica.

Por su lado, el **BPPR** afianza que la conducta de la señora ROSADO MARTÍNEZ fue una de flagrante violación a la integridad, honestidad y valores que rigen las operaciones del **BPPR**. Asegura, además, que su despido fue por

---

[50] *Srio. Del Trabajo v. G.P.Inds., Inc.*, 153 DPR 223,244 (2001).
[51] *González Santiago v. Baxter Healthcare, supra*, a la pág. 292, citando *Jusino et als. v. Walgreens*, 155 DPR 560, 573 (2001).
[52] *González Santiago v. Baxter Healthcare, supra*, a la pág. 293; *Rivera v. Pan Pepín*, 161 DPR 681, 689-690 (2004).

*justa causa* y en conformidad a lo instaurado en la Ley Núm. 80 de 1976. Añade que, de la prueba en su poder, presentada surge con claridad que la señora **ROSADO MARTÍNEZ** tomó para sí alimentos sin pagarlos.

Como cuestión de umbral, precisa señalar que, a tenor con la normativa atinente a la revisión de *sentencia sumaria*, y luego de analizar concienzudamente los respectivos escritos presentados, atinamos que la *Solicitud de Sentencia Sumaria* presentada el 8 de septiembre de 2023 por el **BPPR** cumple con los requisitos de forma estatuidos en la Regla 36 de las de Procedimiento Civil de 2009; y la *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial* presentada el 20 de septiembre de 2023 por la señora **ROSADO MARTÍNEZ** no cumple con los requisitos de forma estatuidos en la Regla 36 de las de Procedimiento Civil de 2009. Esto es, aun cuando la señora **ROSADO MARTÍNEZ** contestó cada uno de los incisos de los hechos materiales que no están en controversia no hizo referencia o alusión a los párrafos o las páginas de las declaraciones juradas o cualquier otra prueba admisible en evidencia que sustentara su posición, tal y como lo exige la Regla 36.3 (b) de las de Procedimiento Civil de 2009. No controvirtió los videos o imágenes presentadas por el **BPPR**; se limitó a expresar que el **BPPR** no contaba con prueba pericial; el *Informe de Investigación* rendido por el señor Favier Santana Vázquez es evidencia no admisible por ser prueba de referencia; y existe un conflicto de interés. Ello, sin embargo, no dispone sin más de la controversia ante nuestra consideración.

Al revisar la totalidad del expediente judicial, este revela que el foro *a quo* aplicó correctamente la Regla 36 de las de Procedimiento Civil de 2009. En ese sentido, determinó los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial. En consecuencia, acogemos los hechos no controvertidos.[53]

---

[53] No es aconsejable usar el mecanismo de sentencia sumaria en casos donde hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial para dilucidar la controversia. *Segarra Rivera v. International Shipping Agency, Inc.*, 208 DPR 964, 980 (2022).

Innegablemente, al encontrarnos ante una controversia de índole laboral, resulta menester justipreciar el alcance del *Manual de Empleados* del **BPPR**. El alusivo *Manual* incluye un Código de Ética, el cual describe y estipula diferentes acciones o circunstancias que, de ser desplegadas por su personal, podrían estar sujetos a **sanciones progresivas hasta la terminación del empleo**, dependiendo en gran medida de la **severidad del acto o falta**.[54] Inclusive, el referido *Manual* dispone y faculta al **BPPR** a realizar investigaciones sobre controversias éticas.[55]

Con todo eso en perspectiva, uno de los elementos esenciales para aludir que la señora **ROSADO MARTÍNEZ** ejecutó una acción deshonesta, por la cual, incumplió con el *Manual* y vulneró el buen nombre del **BPPR** como institución financiera es lograr identificarla sin ningún margen a duda. En ese contexto, al valorar la prueba demostrativa presentada, específicamente las imágenes de las cámaras de seguridad, notamos que el 16 de septiembre de 2021, la señora **ROSADO MARTÍNEZ**, efectivamente, se reportó a su lugar de trabajo alrededor de las 8:00 de la mañana.[56]

Más adelante, como a las 9:51:18 de la mañana del mismo día, se puede divisar a la señora **ROSADO MARTÍNEZ** salir de su área de trabajo. Al constatar la siguiente toma de vídeo, la cual es en el interior del establecimiento La Hacienda, como alrededor de las 10:00 de la mañana, se puede avistar a la señora **ROSADO MARTÍNEZ** efectuando un pago en la caja registradora, se dirige a la mesa de artículos y, acto seguido, agarra un paquete de lo que parecen ser galletas, el cual coloca en la bolsa que cargaba desde el momento en que realizó el pago en la caja registradora.[57]

---

[54] (énfasis nuestro).

[55] Apéndice de la *Apelación Civil*, págs. 302–313.

[56] Resulta fundamental reconocer que las fotografías utilizadas para lograr identificar correctamente a la señora **ROSADO MARTÍNEZ** *emanan* de capturas de imágenes a los vídeos de las cámaras de seguridad. Véase *Solicitud de Sentencia Sumaria* Video **BPPR**, Cámara 36 y 37– 8:01:24; **Imágenes 615–628**. Véase Apéndice de la *Apelación Civil*, págs. 435–448. Cabe destacar que en las imágenes la dama a observar lucía una **blusa manga larga color blanco o claro con mahones oscuros, mascarilla negra**, zapatos altos color claro, y un reloj de fondo blanco en su muñeca derecha. (énfasis nuestro).

[57] Véase Video HMC Popular– Cámara 03 –10:01:30.

Inicialmente, se podría interpretar que la señora **ROSADO MARTÍNEZ** prepagó esos artículos justo antes de agarrarlos, pero al contemplar detenidamente la grabación y las imágenes, podemos distinguir como continúa visualizando las mercancías y al cabo de poco más de un (1) minuto sale de La Hacienda.[58] Al seguir revisando las cámaras de vídeo se puede notar como a las 11:00 de la mañana, la señora **ROSADO MARTÍNEZ** regresa a su área de trabajo, al entrar por el elevador derecho.[59] Así, a las 11:38:50 de la mañana, se puede avizorar cómo la señora **ROSADO MARTÍNEZ** sostiene una bolsa- idéntica a la que cargaba al salir de La Hacienda –y la coloca encima de su escritorio.[60] Una hora más tarde, se puede vislumbrar como la señora **ROSADO MARTÍNEZ** toma sus pertenencias incluyendo la bolsa– que cargaba al salir de La Hacienda -y se marcha.[61] Es de vital importancia apuntar que el tribunal apelado al dictar su decisión y formular sus determinaciones de hechos, escrutó las imágenes o fotografías que emanan esencialmente de las cámaras de seguridad de La Hacienda y el **BPPR**.

Particularmente, cuando calificamos las determinaciones de hechos 52 a la 56 concordamos que el foro impugnado valoró las imágenes basándose **únicamente** en el *Informe de Investigación* hecho por el personal del **BPPR** y lo declarado por la propia señora **ROSADO MARTÍNEZ** en la deposición. Por ejemplo, al observar la imagen 615 presentada por el **BPPR**, notamos que la señora **ROSADO MARTÍNEZ** afirmó: "[n]o se si soy yo, porque verdaderamente estoy mirando el calzado, no se parece a mí. No es el tipo de calzado... yo no me reconozco".[62] Por lo tanto, le muestran la fotografía 616, y en esa ocasión expresó: "[e]sta soy yo". Es decir, la señora **ROSADO MARTÍNEZ** admitió ser la dama de la imagen 616.[63]

---

[58] *Íd.*, Cámara 3- 10:02:45.
[59] Véase *Solicitud de Sentencia Sumaria* Video BPPR, Cámara 36 y 37– 11:01:45 -57. La dama poseía las mismas descripciones físicas anteriormente descritas y en esta ocasión llevaba consigo una cartera color claro.
[60] *Íd.*, Cámara 36 y 37– 11:38:50– 54.
[61] Véase *Solicitud de Sentencia Sumaria* Video BPPR, Cámara 36 y 3 – 12:53:49. Véase, además, Cámara 39, 12:53:56.
[62] Apéndice de la *Apelación Civil*, pág. 216.
[63] *Íd.*

Ahora bien, si escrutamos con detenimiento la ilustración 616, donde la señora **ROSADO MARTÍNEZ** se identificó, se puede describir que en esa imagen la dama se muestra con una blusa de manga larga color blanca o clara, luce una mascarilla y está cargando una bolsa. Adicionalmente, se percibe toda su área de trabajo. Por ende, si la señora **ROSADO MARTÍNEZ** reconoció y admitió ser la dama que muestra la fotografía 616, indudablemente es la misma mujer que muestran las imágenes 617, 619, 623, 625, 626 y 627, pues coincide con las mismas descripciones.[64]

Así y todo, al escudriñar de manera minuciosa la deposición tomada el 23 de febrero de 2023, denotamos que la señora **ROSADO MARTÍNEZ** admitió: (1) conocer las políticas de empleo y el *Manual de Empleados* del **BPPR**; (2) en la primera reunión que tuvo con la señora Michelle Otero y el señor Favier Santana no la despidieron, pero le apercibieron de la investigación en su contra; (3) la dama saliendo del elevador en las capturas de imagen es ella;[65] (4) iba a La Hacienda de cuatro a cinco veces a la semana y siempre compraba "algo más" que la pasta;[66] y (5) si se prueba que un empleado incurrió en acciones deshonestas como una apropiación ilegal, se justifica un despido sin considerar la trayectoria de ese empleado.[67]

Por otra parte, el **BPPR** despliega que los documentos generados por la investigación constituyen en derecho un *récord de negocios y actividades* que se realizan con regularidad. De manera que, no están sujetos a la regla de exclusión de prueba de referencia. Para que un récord sea admisible bajo la Regla 805(F) de las Reglas de Evidencia de Puerto Rico se tiene que cumplir con los siguientes requisitos: (1) se preparó en o cerca del momento en que ocurrieron los sucesos o las actividades mencionadas por una persona que

---

[64] Apéndice de la *Apelación Civil*, págs. 435–438.

[65] No solamente admite que la dama en la imagen esa ella, sino que añadió: "[a]unque esa sea yo, todo lo que saqué de ese establecimiento, día a día que fui, todo lo pagué. Yo no me he robado nada." Apéndice de la *Apelación Civil,* pág. 212.

[66] En los anejos incluidos con la *Solicitud de Sentencia Sumaria,* hay un recibo de pago con fecha del 16 de septiembre de 2021, a las 11:34 a.m., mediante el cual se refleja una transacción por el total de $8.28, que fue saldado con $10.00 en efectivo. Tal recibo solamente muestra el pago por una "*Pasta Deli*.". Apéndice de la *Apelación Civil,* pág. 214.

[67] Apéndice de la *Apelación Civil,* págs. 208–219.

tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta; (2) se llevó a cabo en el curso de la actividad realizada con regularidad, y (3) se preparó como una práctica regular de dicha actividad. [68]

El informe rendido el 26 de octubre de 2021 aborda la investigación efectuada por el señor Santana Vázquez a raíz de un correo electrónico recibido el 7 de octubre de 2021 que le fuese remitido por la señora Michelle Otero Arroyo, oficial de Recursos Humanos del Departamento de Asesoría Laboral del **BPPR**.[69] Por ende, concordamos que el informe cursado por el señor Santana Vázquez, a raíz del referido de la División de Auditoría del **BPPR**, es uno que se realiza como parte de sus funciones como auditor investigativo interno del **BPPR** y se redactó como una práctica regular de dichas funciones o actividades. Así pues, **ni** constituye prueba de referencia **ni** existe conflicto de interés. Aparte, desde el 1 de diciembre de 2021, la señora **ROSADO MARTÍNEZ** tuvo tiempo suficiente para realizar descubrimiento de prueba.

Es nuestro deber revisar si el foro de instancia aplicó correctamente el derecho al asunto que nos ocupa. Resolvemos en la afirmativa. Lo cierto es que la señora **ROSADO MARTÍNEZ** no logró impugnar o refutar que ella es la persona que sale en las grabaciones y capturas de imagen. Tampoco logró persuadirnos de la existencia de hechos en controversia, ni impugnó la documentación que anexada a la *Solicitud de Sentencia Sumaria*. En

---

[68] Véase la Regla 902(K) de Evidencia y Chiesa, Ernesto L., Reglas de Evidencia de Puerto Rico 2009, Publicaciones J.T.S., págs. 261-261. La Regla 805 (F) de las de Evidencia de Puerto Rico dispone: *Récords de actividades que se realizan con regularidad*: Un escrito, informe, récord, memorando o compilación de datos -en cualquier forma- relativo a actos, sucesos, condiciones, opiniones o diagnósticos que se hayan preparado en o cerca del momento en que éstos surgieron, por una persona que tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta, si dichos récords se efectuaron en el curso de una actividad de negocios realizada con regularidad, y si la preparación de dicho escrito, informe, récord, memorando o compilación de datos se hizo en el curso regular de dicha actividad de negocio, según lo demuestre el testimonio de su custodio o de alguna otra persona testigo cualificada, o según se demuestre mediante una certificación que cumpla con las disposiciones de la Regla 902(K) o con algún estatuto que permita dicha certificación, a menos que la fuente de información, el método o las circunstancias de su preparación inspiren falta de confiabilidad. El término negocio, según se utiliza en este inciso, incluye, además de negocio propiamente, una actividad gubernamental y todo tipo de institución, asociación, profesión, ocupación y vocación, con o sin fines de lucro.
[69] Apéndice de la *Apelación Civil*, págs. 389-419.

definitiva, la acción efectuada constituye ***conducta impropia suficiente para justificar un despido*** al amparo de la Ley Núm. 80 de 1976. Por tal motivo, colegimos que el tribunal primario no erró ni abusó de su discreción, cometió perjuicio o error manifiesto al declarar ha lugar la *Solicitud de Sentencia Sumaria* presentada 8 de septiembre de 2023 por el **BPPR.** Toda vez que su determinación es esencialmente correcta y encontró fundamento en los documentos que obran en el expediente judicial. En conclusión, **no** incidió los errores señalados.

### - IV -

Por los fundamentos antes expuestos, ***confirmamos*** la *Sentencia* dictaminada el 2 de febrero de 2024 por el Tribunal de Primera Instancia, Sala Superior de San Juan.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal, y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Lebrón Nieves concurre con el resultado sin opinión escrita. La Jueza Santiago Calderón concurre y expresa que es necesario puntualizar que los 24 anejos incluidos en la Moción de Sentencia Sumaria presentada por el Banco Popular de Puerto Rico, incontrovertible por la apelante, demuestran inequívocamente que las causas de acción de represalia y despido injustificado no se sostienen jurídicamente, por lo cual el foro apelado aplicó y adjudicó correctamente la normativa jurídica.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones